MARCUS BRISBANE and       :
LATITIA MILLER,          :
     Plaintiffs,          :
                       :
v.                         :
                       :
ROBERT MILANO, LOUIS     :
GONZALEZ, WAYNE NEWKIRK, :        CIVIL ACTION NO.
JOHN W. MURPHY, and      :        3:08-cv-1328
ROBERT CROVO,         :
     Defendants.        :        July 27, 2010

**MEMORANDUM OF DECISION GRANTING DEFENDANTS'**
**MOTION TO DISMISS [Doc. #22] and GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [Doc. #20]**

     The Plaintiffs, Marcus Brisbane (Brisbane) and Latitia Miller (Miller), bring this action for damages against the Defendants, Chief of Police for the City of Torrington Robert Milano (Milano) in his official and individual capacities, Detective Louis Gonzalez (Gonzalez) in his individual capacity, Sergeant Wayne Newkirk (Newkirk) in his individual capacity, Officer John W. Murphy (Murphy) in his individual capacity, and Tax Collector Robert Crovo (Crovo) in his official and individual capacities. The Plaintiffs allege four types of claims. The first is a violation of their equal protection rights under the Fourteenth Amendment as prescribed by 42 U.S.C. §§ 1983 and 1981 against Milano, Gonzales, Newkirk, and by operation of law the City of Torrington (Claims One and Two). The City of Torrington is not a named Defendant in this action. The United States Supreme Court, however, has held that "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and

an opportunity to respond."  Brandon v. Holt, 469 U.S. 464, 471-72 (1985).

"'[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  Id. at 472 n.21.  Here, no claim has been made that the City of Torrington was without due notice of the proceedings.

Second, Brisbane asserts a takings claim alleging that Milano seized his vehicle for public use, and accelerated its depreciation through omission without fair compensation, in violation of the Takings Clause of the Fifth and Fourteenth Amendments as prescribed by 42 U.S.C. § 1983.  Brisbane also alleges common law negligence against Milano and Murphy for failing to maintain adequate procedures to protect the value of his impounded vehicle (Count Three).  Finally, Brisbane alleges violations of the Fifth and Fourteenth Amendments as enforced by 42 U.S.C. § 1983, as well as a common law claim for misappropriation of municipal funds against Milano, Murphy, and Crovo for collecting monetary fees for the storage of motor vehicles at the City's Impound Lot to supplement the City taxes paid to maintain the Lot (Count Four).

Currently pending before the Court are a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), 12(c), 12(d), 12(h)(2)(B), 12(h)(3), and 12(i), all four Counts of the Plaintiffs' complaint for lack of jurisdiction and failure to state a claim upon which relief may be granted [Doc. #22], and a motion for summary judgment as to Counts One, Two, and Three pursuant to Fed. R. Civ. P. 56(c) and D. Conn. L. Civ. R. 9.  [Doc. #20].

For the reasons set forth below, the motion to dismiss is GRANTED, and the motion for summary judgment is GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties' pleadings and submissions in connection with the motion to dismiss and the motion for summary judgment establish the following undisputed facts. Brisbane is an adult black male, and Miller is an adult black female. Both Plaintiffs are residents of Torrington, Connecticut. On or about September 2, 2005, Brisbane noticed that a substantial amount of money was missing from his home. Based on statements made by other individuals, Brisbane believed that Jason Lind (Lind), an adult white male, had broken into his house and stolen the money because Lind was seen fleeing the area.[1]

On or about September 3, 2005, Brisbane told Lind to meet him at his house. When Lind arrived, Brisbane brought him down to the basement and demanded the return of his money. Lind stated he did not know where the money was, and Brisbane then pointed a gun at Lind, choked him with a rope, and threatened to kill him if he did not return the money, whereupon Lind admitted the money was at his house. Brisbane accompanied Lind to his house along with Steven Morales and Miller, who brought the gun with her. At Lind's house, the group encountered Lind's brother, Eric Lind. Brisbane then accompanied Lind to the basement to retrieve a stack of money, which was stashed in the wall under the basement

---

[1] Maria Fantasia (Fantasia) was riding in a car passing Brisbane's house during the afternoon of September 2, 2005, and witnessed a black car, in which she believed Jason Lind was a passenger, back out of the driveway to Brisbane's home at a high rate of speed. Fantasia told Lindsey Stovall (Stovall) about the incident. Stovall then relayed Fantasia's experience to Steven Morales (Morales). Ultimately, Morales told Brisbane what Fantasia had said she had witnessed.

staircase.  When Brisbane discovered some of his money was missing, Lind disclosed that he had given $1,500 to another white male, Dustin Whitten (Whitten), to hold a day or two before, and Lind promised to retrieve it.

Brisbane forced Lind and Eric Lind to accompany him to Whitten's house where Brisbane entered, uninvited, and demanded the return of his money. Brisbane threatened Whitten with force if the money was not returned.  While Brisbane threatened Whitten, Miller stashed the gun she and Brisbane had been brandishing in the bushes near Whitten's house.  The police ultimately recovered a gun matching the descriptions given by Lind, Eric Lind, and Whitten.  When Whitten said he would need to retrieve the missing money from his mother's car, Brisbane forced Lind to accompany Whitten while Eric Lind stayed with Brisbane and Miller. Lind obtained the $1,500 from Whitten, and returned to Brisbane's house. Ultimately, even though $4,000 was still missing, Brisbane and Miller allowed Lind and Eric Lind to leave, with the condition that they find the rest of the money.  The brothers then went to a motel, where Lind fell asleep.

After Whitten left Lind, he went to the Torrington Police Department (TPD) to report that Brisbane had threatened him and kidnapped Lind.  In Whitten's initial sworn statement to the police, Whitten stated that he had seen an injured Lind in the trunk of Brisbane's car, wrapped up in a carpet, and that he believed Brisbane was in the process of bringing Lind to New York City to possibly kill him.  Whitten recanted this portion of his initial statement a week later, saying that he told the police that he had seen Lind in the trunk of Brisbane's car because Lind had asked him to tell the police that, and because Whitten was scared.  Lind apparently told

Whitten to lie to the police because he believed Brisbane was going to bring him to New York to "take care of him," and he hoped that alerting the police early would help them find him. Whitten was ultimately convicted of filing a false police report.

Responding to Whitten's report of a life-threatening kidnapping in progress, the TPD began searching for both Brisbane and Lind. The TPD discovered Lind at the Lakeside Motel where, although he had apparent injuries consistent with being choked with a rope, he refused medical treatment. After investigating and determining they were involved with the kidnapping of Lind, the TPD arrested Brisbane and Miller and seized Brisbane's Lexus, the car used to transport Lind and Eric Lind during the kidnapping event.

During an interview Gonzales conducted with Brisbane in the booking area of the TPD, Brisbane stated that he went to Lind's house to talk with Lind's mother about the whereabouts of $5,000 he believed Eric Lind had stolen from his house and that he did not know anything about the robbery or kidnapping of Lind. Brisbane further stated that he was a victim because his money had been stolen from him the day before, but refused to discuss his case the following day when Newkirk offered to interview him. After Brisbane refused to discuss his case, the TPD decided not to investigate the alleged robbery of Brisbane's home and did not regard Lind, Eric Lind, or Whitten as larceny suspects.

Brisbane and Miller subsequently filed a notice of civil rights infringement and intent to sue with the Town Clerk of the City of Torrington. They alleged that by condoning criminal actions of Lind, Eric Lind, and Whitten, the TPD denied Brisbane and Miller the rights afforded white citizens to enjoy the security and equal benefit

of the laws. The receipt of Brisbane and Miller's intent to sue did not alter the TPD's decision not to pursue an investigation of Lind, Eric Lind, or Whitten, because, according to the officers involved with the case, it is difficult to obtain arrest warrants when the alleged victim of a crime refuses to provide any details about the alleged criminal activity.

Brisbane ultimately pleaded guilty to robbery in the first degree, and burglary in the second degree, and was sentenced to a term of imprisonment. After his incarceration, the State of Connecticut instituted a forfeiture action for Brisbane's Lexus through which Brisbane and the State agreed by Stipulation dated January 25, 2008 for the return of the car upon the forfeiture of the $1,395.90 seized upon his arrest to defray the storage costs while the Lexus was held in the City Impound Lot. The State court issued an order on April 29, 2008 that the Lexus be returned to Brisbane or destroyed. Brisbane contends that the Lexus was worth $19,000 on the date of seizure, and that the car was ultimately sold for only $6,000. Miller also pleaded guilty as an accessory to both robbery in the first degree and burglary in the second degree for her role in the efforts to recover the stolen money, and was likewise sentenced to a term of imprisonment.

## II. DEFENDANTS' MOTION TO DISMISS

As an initial matter, because the motion to dismiss was filed after the pleadings were closed, the Court will treat the motion to dismiss as a motion for judgment on the pleadings under Rule 12(c). See Nicholas v. Goord, 430 F.3d 652 (2d Cir. 2005). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim."

<u>Patel v. Contemporary Classics of Beverly Hills</u>, 259 F.3d 123, 126 (2d Cir. 2001).
Pursuant to Rule 8, a pleading must contain "a short and plain statement of the
claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To
satisfy this pleading standard, the plaintiff need not plead detailed factual
allegations. <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Nevertheless, "[a]
pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements
of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked
assertion[s]' devoid of 'further factual enhancement.'" <u>Id.</u> (internal quotations
omitted). "To survive a motion to dismiss, a complaint must contain sufficient
factual matter, accepted as true, to 'state a claim to relief that is plausible on its
face.'" <u>Id.</u> In deciding a Rule 12(c) motion, the court must accept all factual
allegations in the complaint as true and draw all reasonable inferences in the
plaintiff's favor. <u>Hayden V. Paterson</u>, 594 F.3d 150, 160 (2d Cir. 2010).

In evaluating a motion to dismiss, the Court should follow a "two-pronged
approach" to evaluate the sufficiency of the complaint. <u>Hayden v Paterson</u>, 594 F.3d
150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that,
because they are no more than conclusions, are not entitled to the assumption of
truth.'" <u>Id.</u> (quoting <u>Iqbal</u>, 129 S.Ct. at 1949-50). "At the second step, a court should
determine whether the 'well-pleaded factual allegations,' assumed to be true,
'plausibly give rise to an entitlement to relief.'" <u>Id.</u> (quoting <u>Iqbal</u>, 129 S.Ct. at 1950).

## A. <u>Equal Protection Claims (Counts One and Two)</u>

In the present case, the Plaintiffs assert that the TPD arrested Brisbane and
Miller (Count One), and refused to investigate Brisbane's robbery complaint (Count

Two) because they are black, and the Lind brothers and Whitten are white.  The thrust of the Plaintiffs' claims is that, by failing to identify Brisbane as a victim because of his race, and basing the decision not to investigate the Lind brothers in connection with the burglary of Brisbane's home on their race, the TPD violated Brisbane's right to equal protection under the law.

In their motion to dismiss, the Defendants contend that Brisbane's claims should be dismissed because they are not ripe for adjudication, as the TPD has until September 3, 2010 under the relevant statute of limitations to investigate the robbery of Brisbane's home and arrest the culprits.  Accepting the Plaintiffs' allegations that the TPD has not investigated as true, along with the fact that the Defendants have admitted that the TPD made the decision not to investigate the Lind brothers or Whitten, the lack of ripeness argument is unavailing.  The Plaintiffs' injury, if any, as to Counts One and Two accrued once the TPD made the decision not to pursue any investigation of the Lind brothers and Whitten.  See Barrett v. United States, 689 F.2d 324, 333 (2d Cir. 1982) (Federal claims accrue "when the plaintiff 'knows or has reason to know of the injury which is the basis of his action.'").  The Defendants have failed to demonstrate that the Plaintiffs' claims are not yet ripe for adjudication.

It is nevertheless appropriate to dismiss both of the Plaintiffs' equal protection claims under the Hayden two-prong analysis because the complaint alleges simply that the TPD investigated and arrested the Plaintiffs and failed to investigate or arrest the Lind brothers and Whitten because of race without alleging any supporting or explanatory facts.  In fact, many of the facts alleged in the

complaint demonstrate that the TPD not only responded to the reported criminal activity surrounding the burglary of Brisbane's home and the subsequent Lind kidnapping reasonably, but also that there was no racial motivation in the decision to investigate Brisbane and Miller but not the Lind brothers and Whitten.

The complaint alleges that on September 3, 2005, the TPD received a report from Whitten that Brisbane and Miller took Lind against his will, and that Lind was currently injured, bound in a carpet, and locked in the trunk of Brisbane's Lexus headed to New York City to be "taken care of." The TPD immediately commenced an investigation into this seemingly imminently life-threatening situation. Brisbane and Miller were ultimately arrested and pleaded guilty to crimes associated with the kidnapping. The complaint also alleges that in the course of their investigation of the on-going kidnapping incident, the TPD learned that the Brisbane and Miller began their "sequence of criminal offenses" because Lind had unlawfully entered and stolen money from Brisbane's house on September 2, 2005. [Doc. #1, at 4]. The TPD did not commence an investigation into this non-violent, already concluded burglary incident, however. Finally, the complaint establishes that the TPD did, in fact, investigate and arrest Whitten in connection with the false notarized statement he provided the TPD to initiate their investigation of Brisbane and Miller.

After excluding the mere conclusory allegations in the complaint, namely that the police arrested Brisbane and Miller and refused to investigate the Lind brothers and Whitten solely because of race, the remaining facts establish no more than that, in investigating and arresting Brisbane and Miller, the TPD responded to an imminently dangerous situation in progress, and that they exercised appropriate

police discretion in deciding not to pursue an investigation into the already

concluded, non-violent allegations against the Lind brothers and Whitten.  See

Fedor v. Kudrak, 421 F.Supp.2d 473, 481 (D. Conn. 2008) (noting that "[c]ourts have

consistently expressed an unwillingness to intrude upon a police officer's

discretion to decide when to effectuate an arrest") (citing Lunini v. Grayeb, 395 F.3d

761, 770 (7th Cir. 2005) (finding that an officer's failure to arrest an individual

involved "an ordinary exercise of police discretion" and thus it was "not obvious

how the police officers' failure to arrest . . . implicates [the plaintiff's] rights under

the Equal Protection Clause in the first place"); Rickets v. City of Columbia, 36 F.3d

775, 780 (8th Cir. 1994) (noting that an "officer's discretion to determine when to

arrest" is "a fundamental part of our criminal system"); McCleskey v. Kemp, 481

U.S. 279, 297 (1987) (noting, as a general matter, that "discretion is essential to the

criminal justice process.")).  Further, the TPD demonstrated that they would and, in

fact, did investigate and arrest white criminals by charging Whitten with falsely

reporting an incident to the police.

Accordingly, although the Defendants have failed to demonstrate that the

Plaintiffs' claims are not yet ripe for adjudication, the motion to dismiss as to

Counts One and Two is GRANTED because the complaint alleges insufficient facts

to support those claims.  Moreover, in the alternative, even if the Plaintiff has

sufficiently alleged equal protection claims in Counts One and Two, these claims fail

for the reasons stated below in the discussion of the Defendants' motion for

summary judgment.  See infra Section III.A.

## B. Takings Claims (Counts Three and Four)

In Counts Three and Four of the complaint, Brisbane alleges that the City of Torrington has taken his property without just compensation in violation of the Takings Clause of the Fifth and Fourteenth Amendments. Brisbane first alleges that he has not been justly compensated for the public use and depreciation of his Lexus while it was stored and, he claims, inadequately and negligently maintained in the outdoor City Impound Lot (Count Three). Secondly, Brisbane maintains that the City of Torrington maintains an unlawful policy and procedure of collecting fees from the owners of the motor vehicles stored at the City Impound Lot in addition to the City taxes paid to maintain the lot (Count Four).

The Fifth Amendment to the United States Constitution provides, in relevant part, that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. AMEND. V. The Constitutional proscription on uncompensated takings, which has come to be known as the "Just Compensation Clause," applies to the States through the Fourteenth Amendment. See Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226, 239 (1897). Nevertheless, "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." Bennis v. Michigan, 516 U.S. 442, 452 (1996). It is also clear that "the police power encompasses the government's ability to seize and retain property to be used as evidence in a criminal prosecution." Amerisource Corp. v United States, 525 F.3d 1149, 1153 (Fed.Cir. 2008) (citing Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 309-10 (1967)). Additionally, "[o]nce the government has

lawfully seized property to be used as evidence in a criminal prosecution, it has wide latitude to retain it . . . regardless of the effect on that property." Id. at 1154.

The Supreme Court has held that police seizure of property pursuant to the police power does not constitute a taking under the Fifth Amendment. Bennis, 516 U.S. at 453. In Bennis, the Supreme Court determined that forfeiture of an innocent wife and co-owner's interest in a vehicle used in connection with the husband's sexual activity with a prostitute was not a taking of private property for public use in violation of the takings clause because the vehicle was forfeited pursuant to the firmly fixed punitive and remedial jurisprudence of the country under which the police power does not implicate the power of eminent domain. Id.

The Court of Federal Claims and the Federal Circuit have applied the Bennis principal on several occasions to the same effect. In a case dealing with the investigation of a custom screen printing business involved in the unlicensed manufacture of designs protected by copyright where the government seized transparencies, computer equipment, and machinery, the Court of Federal Claims held that "seizing belongings for a criminal investigation is not a taking for a 'public purpose' under the Fifth Amendment and thus, a seizure in connection with a criminal investigation does not give rise to a claim for just compensation." Seay v. United States, 61 Fed.Cl. 32, 35 (2004). In that case, the seized property was damaged when the plumbing ruptured at the storage facility. Nevertheless, the Court held that "[t]he government ultimately returned the belongings, although damaged, and, therefore, the government never 'took' the plaintiff's belongings. . . .

There is no taking associated with the retention of property that is ultimately returned." Id.

Further, in Amerisource Co. v. United States, the Federal Circuit held that drugs seized from a wholesale pharmaceutical distributor as evidence in criminal proceedings against third parties did not constitute a taking even though the government held the drugs until they expired, and even though they were never introduced as evidence in the criminal proceedings. The Court stated that "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." Amerisource Co. v. United States, 525 F.3d 1149, 1153 (Fed. Cir. 2008). Notably, the Federal Circuit Court has also applied this principle to claims for the value of depreciation of vehicles in the context of police seizure and retention of vehicles suspected of involvement in criminal endeavors. In United States v. One 1979 Cadillac Coupe De Ville, 833 F.2d. 994 (Fed. Cir. 1987), the Federal Circuit held that a claimant was not entitled to a monetary award for the amount by which his vehicle decreased in value while in Government custody. "The government's possession of the vehicle between the seizure and the jury verdict was not a taking of the vehicle for which [the claimant] was entitled to just compensation." Id. at 1000.

Finally, the District of Connecticut has also applied the Bennis principle in at least one case, holding that "[i]t is well-established that 'if the government acts pursuant to a forfeiture statute, it may seize personal property without compensating the owner.'" Leduc v. Tilley, No. 3:05-cv-157(MRK), 2005 WL 1475334, at *3 (D. Conn 2005).

Moreover, even if a property owner has sustained a taking without just compensation, he "has not suffered a violation of the Just Compensation Clause until [he] has unsuccessfully attempted to obtain just compensation through the procedures provided by the State." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, (2d Cir. 2995) (citing Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195 (1985)). "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." Williamson County Reg'l Planning Comm'n, 473 U.S. at 194. "Thus, before a plaintiff may assert a federal takings claim, he must first seek compensation from the state if the state has a 'reasonable, certain and adequate provision for obtaining compensation.'" Villager Pond, 56 F.3d at 379-80.

Both the Second Circuit and the District of Connecticut have explicitly recognized the existence of a right of redress and approved the procedure to obtain just compensation established under Article First, § 11 of the Connecticut State Constitution, which states that "[t]he property of no person shall be taken for public use, without just compensation." See Villager Pond, 56 F.3d at 380; Katz v. Stannard Beach Ass'n, 95 F. Supp. 2d 90, 97-98 (D. Conn. 2000). Furthermore, "[a]lthough there is no separate statutory remedy, this clause [of the Connecticut State Constitution] can serve as the basis for an inverse condemnation action for just compensation." Arrigoni Enterprises, LLC v. Town of Durham, 606 F. Supp. 2d 295, 299 (D. Conn. 2009) (citing Laurel, Inc. v. State, 169 Conn. 195, 200 (1975)).

Finally, a governmental taking claim "is not ripe until . . . the property owner has sought just compensation though the procedures provided by the state for

doing so, and has been denied said just compensation." <u>Williamson County Reg'l Planning Comm'n</u>, 473 U.S. at 195. The Second Circuit has further held that a plaintiff is "required to look to the state for compensation [under the state constitution] before its [federal] taking claim will lie." <u>Villager Pond</u>, 56 F.3d at 380.

### 1. <u>Count Three Takings Claim</u>

With regard to Count Three, Brisbane has not alleged any facts sufficient to support the takings claim. The complaint establishes that the TPD lawfully seized the Lexus during the kidnapping investigation as the vehicle in which Brisbane allegedly kidnapped Lind. Then, as a result of the State forfeiture action, the TPD was required to, and did return the Lexus to Brisbane. Much like the case in <u>Seay</u>, the government returned Brisbane's car, although damaged, but nevertheless never "took" the car within the meaning of the Fifth Amendment. Additionally, as set forth in <u>One Cadillac</u>, the decrease in value of a car while in police custody does not constitute a "taking" within the meaning of the Fifth Amendment.

Moreover, even if Brisbane could assert a takings claim against the TPD on the facts alleged, he has not established that he has attempted to obtain just compensation for the depreciation of the car through any State procedure. The Complaint contains only a reference to the proceeding through which the State Court ordered the return of Brisbane's Lexus. [Doc. #1 ¶¶ 64-65]. The State Court order to return the car is irrelevant to Brisbane's inverse condemnation claim for the value of the depreciation of the Lexus. Brisbane has not alleged that he attempted to obtain the value of the car's depreciation through any State Court proceeding or other regulatory process. Moreover, he has not demonstrated that Connecticut

procedures for obtaining such compensation are inadequate or unavailable, particularly in light of the three-year statute of limitations applicable to State inverse condemnation actions, which accrued on April 29, 2008 – the date the car was returned to him – and has not yet expired.  Pursuant to Conn. Gen. Stat. § 52-577, the statute of limitations for an inverse condemnation action is three years.  Conn. Gen. Stat. § 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."  See Orticelli v. Powers, 197 Conn. 9, 16 (1985) (stating the statute of limitations in civil rights cases in Connecticut is established by the local limitation under Conn. Gen. Stat. § 52-577); Wilson v. Garcia, 105 S.Ct. 1938, 1942 (1985) (holding that 42 U.S.C. § 1983 actions are best characterized as personal injury actions for the purposes of determining the applicable statute of limitations); see also Giglio v. Connecticut Light and Power Co., 180 Conn. 230, 241 (1980) (noting that the statute of limitations does not begin to run until continuing course of conduct causing injury is completed).

### 2. Count Four Takings Claim

Brisbane has similarly failed to present evidence sufficient to support a takings claim for the funds he alleges that the City of Torrington misappropriated through the operation of the Impound Lot in Count Four.  He has failed to mention any State procedure whatsoever with regard to the misappropriation claim, and similarly has not demonstrated that Connecticut procedures for obtaining such compensation are inadequate or unavailable.

Therefore, Brisbane's Fifth and Fourteenth Amendment takings claim alleged in Count Three is insufficient in that the value of depreciation of a vehicle while in police custody simply is not a compensable taking, and even if it were, that claim, along with the takings claim in Count Four are not ripe for adjudication in this Court because Brisbane has failed to demonstrate that he attempted to obtain relief through the available State procedures. Accordingly, the Defendants' motion to dismiss as to Counts Three and Four is GRANTED.

### III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

"The standards governing summary judgment are well-settled." <u>Ford v. Reynolds</u>, 316 F.3d 351, 354, 379 (2d Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." <u>Ford</u>, 316 F.3d at 354. "[T]he burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." <u>PepsiCo. Inc., v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to

defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

The Court must "construe the evidence in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in its favor." Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted).

## A. Equal Protection Claims (Counts One and Two)

The Defendants assert that they are entitled to summary judgment as to Counts One and Two of the Plaintiffs' complaint because the Plaintiffs have done no more than allege that the TPD's actions in investigating and arresting Brisbane and Miller, while not investigating or arresting Lind, Eric Lind, or Whitten, were motivated by the fact that Brisbane and Miller are black and Lind, Eric Lind, and Whitten are white. According to the Defendants, because the Plaintiffs have not demonstrated that they were similarly situated to Lind, Eric Lind, and Whitten or that they were subject to selective enforcement (Count One) or denied equal protection (Count Two) of the laws because of the TPD's impermissible consideration of race, they are entitled to summary judgment with respect to Counts One and Two of the Plaintiffs' Complaint. Although Counts One and Two are dismissed for failure to state a claim upon which relief can be granted, see supra Section II.A., in an

abundance of caution, the Court will also address the Defendants' motion for summary judgment.

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. The Supreme Court has held that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). "Traditionally, the Equal Protection clause of the Fourteenth Amendment protects against class-based discrimination," Inturri v. City of Hartford, 365 F. Supp. 2d 240, 248 (D. Conn. 2005), on the basis of race or otherwise. The courts "apply different levels of scrutiny to different types of classifications . . . [and] [c]lassifications based on race or national origin . . . are given the most exacting scrutiny." Clark v. Jeter, 486 U.S. 456, 461 (1988) (internal citations omitted).

The Second Circuit has noted, however, that "the government can treat persons differently if they are not 'similarly situated.'" Able v. U.S., 155 F.3d 628, 631 (2d Cir. 1998). Nevertheless, "when the subject of the different treatment is a member of a class that historically has been the object of discrimination, the Supreme Court has required a higher degree of justification than a rational basis, either strict or intermediate scrutiny." Id.

In this case, however, Brisbane and Miller do not premise their equal protection claims on the "traditional" equal protection analysis. They do not claim that the TPD operated based on a law or policy that "expressly classifies persons on

the basis of race." **See** Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999). They do not claim that the TPD applied a facially neutral law or policy in an intentionally discriminatory manner. **See** Yick v. Wo, 118 U.S. 356 (1886). Nor do they claim that the City of Torrington has a facially neutral statute or policy that has an adverse effect on minorities and that it was motivated by discriminatory animus. **See** Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000) (adopting the standard set forth in Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977)).

Instead, the Plaintiffs premise their complaint on the claim that they have been denied equal protection as a result of selective prosecution, a type of Equal Protection claim that was outlined by the Second Circuit in LeClair v. Saunders, 627 F.2d 606 (2d Cir. 1980). In that case, the Second Circuit stated that "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection." Id. at 608. Rather, the Second Circuit articulated a two-part test to determine whether a person's right to equal protection has been violated by an act of selective prosecution. "To succeed in an equal protection action based upon a selective prosecution, plaintiffs in this circuit must show both '(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race.'" Goldfarb v. Town of West Hartford, 474 F.Supp.2d 356, 368 (D. Conn. 2007) (citing LeClair, 627 F.2d at 609-10)).

"[D]emonstrating that a plaintiff has been treated differently from similarly situated individuals is the '*sine qua non* of a *LeClair* "selective enforcement"

violation.'" <u>Goldfarb</u>, 474 F. Supp. 2d at 368. The level of similarity "between plaintiffs and the person with whom they compare themselves must be extremely high. . . . [T]he standard for determining whether a person's circumstances are similar to the plaintiff's must be . . . whether they are *prima facie* identical." <u>Spanierman v. Hughes</u>, 576 F. Supp. 2d 292, 307 (D. Conn. 2008) (citations omitted, internal quotation marks omitted). Finally, although "[a]s a general rule, whether [individuals] are similarly situated is a factual issue that should be submitted to the jury[,] . . . [t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." <u>Harlen Assocs. v. Inc. Vill. Of Mineola</u>, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

In determining whether groups or persons are similarly situated under the <u>LeClair</u> test, courts in this circuit consistently hold that plaintiffs must compare themselves to groups that are similar in all material respects. For example, in <u>Spanierman v. Hughes</u>, the Court determined that a teacher whose employment contract was not renewed because of his conduct on a social networking website was not similarly situated to other teachers in the school who had profiles on similar social networking websites and whose employment contracts were renewed. The plaintiff in <u>Spanierman</u> had interacted with students inappropriately through his social networking profile whereas the other teachers who had online profiles on the same social networking website had no inappropriate contact with students. The Court held that the fact that the plaintiff and the other teachers "like many others, had MySpace accounts is not, by itself, sufficient to demonstrate that they were all

similarly situated. Instead, it is their conduct that is relevant." <u>Spanierman</u>, 576 F. Supp. 2d at 308. In determining the similarly situated prong of the <u>LeClair</u> test, the Court examined all of the relevant characteristics of the plaintiff and the group of teachers to which he wished to compare himself and found a material factor, namely the contact with students through the social networking website, to be disparate. Thus, if a plaintiff cannot establish a group that is similar to him in all material respects, his selective prosecution claim must fail.

In the present case, the Plaintiffs' equal protection claims fail as a matter of law with respect to both prongs of the <u>LeClair</u> test. First, the Plaintiffs have failed to compare themselves to a group of similarly situated individuals from which they have been treated differently. The TPD investigated the Plaintiffs because Whitten reported an exigent circumstance, namely a life-threatening kidnapping in progress. Brisbane and Miller were arrested for their involvement in that offense and the TPD only learned later that the series of criminal offenses began as a means to recover money previously taken from Brisbane's house. After learning that Brisbane believed the Lind brothers were involved in the previous theft of his money, the TPD determined that Lind, Eric Lind, and Whitten posed no imminent violent threat to which they needed to respond immediately.

The Plaintiffs seek to compare the TPD's investigation of black individuals accused of a life-threatening crime in progress to its failure to investigate a group of white individuals who were allegedly involved in an already-concluded, non-violent burglary and theft of money from Brisbane's home. The fact that Brisbane and Miller ultimately pleaded guilty only to robbery and burglary offenses, and that they

claim Lind, Eric Lind, and Whitten should have been investigated for burglarizing Brisbane's home is not sufficient to characterize the Plaintiffs as situated similarly to Lind, Eric Lind, and Whitten in all material respects in view of the exigency of Whitten's complaint.

It bears noting that Brisbane never filed a formal complaint against the Lind brothers or Whitten on which the police could base an investigation, and further, refused to discuss the matter with Newkirk or provide any additional information after his arrest. Officer Newkirk's report states that Brisbane was afforded an opportunity to be "interviewed concerning the case" [Ex. 4, Doc. # 33-11], which could have constituted a waiver of Brisbane's right to remain silent and against self-incrimination, particularly in light of the fact that Brisbane abducted Lind to recover the money Lind had stolen from Brisbane's home. The two incidents were so closely linked that requiring Brisbane to be "interviewed concerning the case" in order to lodge a criminal complaint effectively deprived him of the opportunity to lodge a complaint. The Court is not persuaded by the Defendants' claim that the decision not to investigate the Lind brothers or Whitten to determine their involvement in the theft of Brisbane's money was premised on the formality of Whitten's kidnapping report and the lack of a formal complaint by Brisbane. The Court nevertheless finds that the disparity in the exigency of the two scenarios alone is sufficient to defeat the similarly situated prong of the <u>LeClair</u> test. In conclusion, despite the fact that Brisbane was deprived of the opportunity to lodge a complaint against the Linds and Whitten, the Plaintiffs cannot, and did not identify

Lind, Eric Lind, or Whitten as similarly situated individuals from whom the Plaintiffs were treated differently.

Secondly, the Plaintiffs have failed to demonstrate that any differential treatment of them by the TPD was based on an impermissible consideration of race. As discussed above, the TPD responded to Whitten's formal complaint of a violent crime in progress when they began their investigation of the Plaintiffs' conduct. The TPD had no exigency prompting an investigation of Lind, Eric Lind, and Whitten. Further, they had a potentially recalcitrant complainant whose complaint could constitute a motive for the offense for which he had been arrested and was in custody at the time of his arrest. By contrast, Lind showed no such reluctance. On the contrary, Lind embellished the facts, heightening the exigency of the circumstances with the intent of inducing the TPD to respond immediately.

Furthermore, the Plaintiffs have not presented any evidence that the TPD's decision not to investigate Lind, Eric Lind, and Whitten was based on race rather than permissible police discretion. As discussed above in Section II.A., there is nothing in the Plaintiffs' complaint or anywhere on the record to substantiate the mere conclusory allegation that the TPD based their decisions on race.

Since the Plaintiffs have failed to satisfy both of the prongs required to establish a claim for "selective prosecution," the equal protection claims asserted in Counts One and Two fail as a matter of law. Accordingly, the Defendants' motion for summary judgment with regard to Counts One and Two is GRANTED.

## B. <u>State Law Claims (Counts Three and Four)</u>

Having dismissed the federal takings claim regarding the depreciation of Brisbane's Lexus (Count Three) and the federal takings claim regarding misappropriation of funds for the City Impound Lot (Count Four), the Court must now consider the appropriateness of exercising supplemental jurisdiction over Brisbane's remaining State law claims for negligence and misappropriation of municipal funds asserted in these two counts. A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C. §1367, which provides, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. §1367(a). Nevertheless, district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) where "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. §1367(c). Furthermore, the Second Circuit has made it clear that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003).

The <u>Valencia</u> Court set forth factors that a district court should consider when deciding whether to exercise supplemental jurisdiction over State law claims after

all federal claims have been dismissed.  See <u>Valencia</u>, 316 F.3d at 305-06.  These factors are:  "(1) whether state law claims implicate the doctrine of preemption; (2) considerations of judicial economy, convenience, fairness, and comity, including the stage of proceedings when the federal claims are dismissed; (3) the existence of novel or unresolved questions of state law; and (4) whether the state law claims concern the state's interest in the administration of its government or require the balancing of numerous important state government policies."  <u>In re Jetblue Airways Corp. Privacy Litig.</u>, 379 F. Supp. 2d 299, 311 (E.D.N.Y. 2005) (discussing <u>Valencia</u>).

In this case, the factors discussed by the Second Circuit militate against exercising supplemental jurisdiction over Brisbane's State law claims.  First, the State law claims do not implicate the doctrine of preemption.  Second, this case is at a relatively early stage of the proceedings, as no trial date has been set.  Third, there appears to be an unresolved issue of State law regarding the authority of a City to fund an Impound Lot with City tax monies and also to collect supplemental funds as storage fees from individuals whose cars are maintained on such lot.  Fourth, the Plaintiffs' State law claims implicate the State's interest in the administration of its government through the imposition of local taxes.

Accordingly, the Court declines to exercise supplemental jurisdiction over Brisbane's State law claims.  These claims are dismissed without prejudice to re-filing in Connecticut Superior Court.

## IV. <u>CONCLUSION</u>

Based upon the above reasoning, the Defendants' motion to dismiss [Doc. #22] is GRANTED.  Furthermore, in the alternative, even if the Plaintiff has

sufficiently alleged equal protection claims in Counts One and Two, the Defendants' motion for summary judgment [Doc. #20] is GRANTED because the Plaintiff has failed to raise any genuine issues of material fact that would preclude summary judgment. The Court declines to exercise supplemental jurisdiction over the Plaintiffs' State law claims, and therefore these claims are dismissed without prejudice to re-filing in Connecticut Superior Court. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: July 27, 2010.